UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-11287-RGS

|  |  |
|---|---|
| METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, Plaintiff, | ) ) ) ) |
| v. | ) ) |
| HAI NHU HUYNH and SPINE CARE AND THERAPY, INC., Defendants. | ) ) ) ) |

## MEMORANDUM IN SUPPORT OF THE DEFENDANTS' MOTION TO DISSOLVE PLAINTIFF'S EX PARTE ATTACHMENTS.

Defendants Hai Nhu Huynh and Spine Care and Therapy, Inc. ("Spine Care") submit this memorandum in support of their motion to dissolve the *ex parte* attachments in the amount of $800,000 that plaintiff Metropolitan Property and Casualty Insurance Company ("Metropolitan") obtained from this Court on June 20, 2005, and again on September 9, 2005.

## I.    INTRODUCTION

Metropolitan's *ex parte* attachments should be dissolved pursuant to Rule 4.1(g) and 4.2(h) of the Massachusetts Rules of Civil Procedure, *see* Fed. R. Civ. P. 64 (law of forum state applies to remedies for pre-judgment security), because it is unable to satisfy its heavy burden of justifying either of the findings necessary to support this extraordinary relief. First, plaintiff cannot demonstrate that it is likely to recover judgment in an amount of $800,000. Indeed plaintiff cannot demonstrate that it is likely to succeed on the merits at all. The affidavits of Metropolitan's "Senior Investigator" Mark Huard, which were the only evidentiary support for

its attachment motions, and are now for the first time subjected to the scrutiny afforded by the

adversary process, are entirely inadequate to demonstrate that Metropolitan will recover even $1:

the affidavits are entirely conclusory, unsubstantiated, and anecdotal, and say not a single word

about any damages Metropolitan might recover if it were to prevail. In short, the Huard

affidavits fail to "set forth specific facts sufficient to warrant the required findings" for an

attachment. Mass. R. Civ. P. 4.1(h). Although Metropolitan's unverified Complaint cannot be

considered for purposes of justifying the attachment, it is worth noting that, despite its sound and

fury, its allegations of fraud — the gravamen of the Complaint — do not even attempt to comply

with Rule 9(b)'s particularity requirements. All four articulated theories of recovery also fail to

state actionable claims. On September 16, 2005, defendants filed a motion to dismiss the

Complaint in its entirety pursuant to Rule 9(b) and 12(b)(6). Attached as Exhibit A is

defendants' brief in support of that motion.

Second, Metropolitan is unable to justify the attachment on the ground that there is a

"clear danger" defendants will conceal or remove assets, a finding required under Rule 4.1(g)

and 4.2(g). The basis for Metropolitan's *ex parte* showing on this issue was that Dr. Huynh has

"utilized," or been "associated" with, several different addresses within the last few years. As

explained below, Dr. Huynh's "association" with these addresses is entirely benign, and in no

way supports the "clear danger" requirement of Rule 4.2.

For these reasons, the attachments should be dissolved.

## II.    BACKGROUND

### A.    The Complaint

Plaintiff's Complaint contains sweeping and widespread allegations regarding a

"systematic" and "perpetual" "fraudulent scheme" executed by defendants. Six of the

Complaint's first seven paragraphs proclaim the alleged "fraudulent scheme," and the rhetoric

2

only accelerates over the remainder of the Complaint. Plaintiff makes wholly general allegations of six categories of "false statements of material facts" in defendants' "patient treatment records and bills," Complaint ¶ 129, and alleges it has been damaged in an amount in excess of $800,000, Complaint ¶ 5(e). The $800,000 figure is based on the sum of payments allegedly made to defendants of over $494,000.00 on 165 individual claims for PIP benefits, Complaint ¶ 69, and an additional $306,000.00 on 79 bodily injury claims. Complaint ¶ 78. In short, Metropolitan's $800,000 *ad damnum* figure is based on the allegation that each and every one of the 244 claims identified in the Complaint — an average claim being for $3,160.00 — was fraudulent.

Despite the sweeping and hyperbolic language in the Complaint, however, the only remotely specific allegations of fraud have to do with bills for services to 16 patients. Complaint ¶¶ 86-114. This represents approximately 7% of the total 244 claims and, using the average claim amount of $3,160.00, suggests that an ad damnum based on these alleged cases of fraud is more like $50,000. Not only is this sum $25,000 below the amount-in-controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332, it is $750,000 below the amount of the *ex parte* attachment plaintiff received. Although Metropolitan insists that these 16 cases in the Complaint are being provided "by way of example only," *see* Complaint ¶¶ 90, 92-94, 96-98, 100, 102, 104, it provides no factual basis for the inference it intends this Court to draw — namely, that the alleged infirmities in the billing records for 16 patients also exist in the records for the 200+ claims that are not included in the Complaint.

But even for the 16 patients identified in the Complaint, no specifics of Metropolitan's fraud allegations are provided. The allegedly fraudulent bills and/or medical records are not attached to the Complaint. Nor are they quoted from or even summarized in the Complaint. No

3

date is provided for any bill sent on behalf of the 16 patients; no specific misstatement in any bill or record is identified. Most significantly, there is no allegation that the allegedly fraudulent bills for these 16 patients were, in fact, paid by the plaintiff. Plaintiff's references to its payments of bills are entirely general and cryptic. Complaint ¶¶ 68-69. *See also id.* ¶ 100 ("Defendants routinely billed for this modality as part of the patient's overall treatment").

## B.    Plaintiff's *Ex Parte* Attachment

On the same day it filed its Complaint, Metropolitan filed two *ex parte* motions for attachment by trustee process against Dr. Huynh and Spine Care. Both motions, brought pursuant to Fed. R. Civ. P. 64 and Mass. R. Civ. P. 4.2, sought an attachment in the amount of \$800,000 and argued that Metropolitan is reasonably likely to recover judgment in an amount equal to or greater than that sum. Memorandum of Law in Support of Metropolitan Property and Casualty Insurance Company's Ex Parte Motion for Approval of Attachment on Trustee Process Against the Defendant, Hai Nhu Huynh ("Pl. Huynh Mem.") at 1; Memorandum of Law in Support of Metropolitan Property and Casualty Insurance Company's Ex Parte Motion for Approval of Attachment on Trustee Process Against the Defendant, Spine Care and Therapy, Inc. ("Pl. Spine Care Mem.") at 1. The Court allowed the motions by marginal notation on the same day they were filed, June 20. The only factual support offered by Metropolitan for its motion was a pair of affidavits by a "Senior Investigator" in its "Special Investigations Unit," Mark O. Huard.[1]

Based on the Huard Affidavits, Metropolitan argued that "there is a reasonable likelihood that it will succeed on the merits," and also that there is "a clear danger that the defendant if notified in advance . . . will withdraw the goods or credits . . . and remove them from the state or

---

[1]    Based on essentially the same factual showing, the Court granted additional *ex parte* attachments (both by trustee process and on Dr. Huynh's home) on September 9, 2005.

will conceal them." It argued that "[t]he alleged fraudulent conduct of Dr. Huynh, which

necessitated the filing of this action, strongly indicates that upon notification of this action, he

will withdraw any credits from the possession of the trustee and/or dissipate any existing credits

in an effort to conceal assets that may be available to satisfy a judgment for damages in this

matter, " Pl. Br. at 4, and noted that "Dr. Huynh has utilized several different addresses within

the last few years, including a current second residence in Texas." *Id.* Metropolitan also argued,

for similar reasons, that Spine Care might be dissolved. Pl. Spine Care Mem. at 5.

Because the Huard affidavits are the entire factual basis for Metropolitan's "likelihood of

success" and "clear danger" showings — the Complaint itself is unverified — they are worthy of

close analysis. The assertions in the affidavit supporting the Huynh attachment papers[2] can be

summarized as follows:

- Paragraphs 1-5 describe Mr. Huard and the initiation of his investigation of defendants, including in ¶ 4 a laundry list of the steps Mr. Huard took in the investigation.

- Paragraph 5 states the alleged conclusion of Huard's investigation: "an extensive and continuing pattern of false and improper medical diagnoses, treatment and billings [by defendants]."

- Paragraph 6 asserts that the testimony of "several patients" is inconsistent with the records, notes, and bills submitted by defendants.

- Paragraph 7 asserts that existing patients of defendants are incorrectly assigned a "new patient" CPT code, resulting in a higher billing rate, but does not indicate the difference in the billing rates or the number of patients involved.

- Paragraph 8 asserts that an unidentified number of patients "have testified that Dr. Huynh arranged meetings in the Spine Care clinic between the patients and attorneys for the purpose of discussing personal injury claims.

- Paragraph 9 asserts that "this information" — presumably the information in ¶¶ 5-7 — is believed by Huard to be true.

- Paragraph 10-25 provides information about "other addresses" associated with Dr. Huynh.

---

[2]      The two affidavits are substantially the same, although the affidavit submitted in support of the Spine Care attachment motion contains additional allegations regarding Spine Care's corporate history and structure.

- Paragraphs 26-29 provide alleged information about Dr. Huynh's bank accounts, insurance, a conclusory assertion about Dr. Huynh's "fraudulent and deceptive" activity, and Huard's belief that the information in the affidavit is true.

In short, the affidavits provide no basis for the sweeping allegation of fraud contained in ¶ 5 or in Metropolitan's counsel's motion papers. Huard's assertions are entirely conclusory and anecdotal, resting on the testimony of an unidentified number of patients, and provide no basis for inferring any "fraudulent scheme," much less a basis for believing that an $800,000 judgment is likely to be recovered by Metropolitan. Indeed the affidavits do not contain a single word to support the motion's allegation of an $800,000 damage figure.

## III.   METROPOLITAN IS NOT ENTITLED TO AN ATTACHMENT

### A.   The Operative Legal Standard

Under Rule 64 of the Federal Rules of Civil Procedure, the law of the forum state applies to remedies for obtaining pre-judgment security. *See Sheehan v. NetVersant-New England, Inc.*, 345 F. Supp. 2d 130, 132 (D. Mass. 2004) (applying Mass. R. Civ. P. 4.2). In Massachusetts, attachments of property and attachments by trustee process are governed by Rules 4.1 and 4.2 of the Massachusetts Rules of Civil Procedure. The procedures for obtaining both kinds of attachments are similar, and both are designed to secure satisfaction of "the judgment for damages and costs which the plaintiff may recover." Mass. R. Civ. P. 4.1(a), 4.2(a).[3]

To obtain either form of attachment, a plaintiff must show that "there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount

---

[3]   Pursuant to M.G.L. c. 246 § 20 "any moneys of the defendant deposited in any account designated as a payroll account shall not be subject to attachment...". M.G.L. c. 246 § 20. When Plaintiff proceeded with the *ex parte* Trustee Process against the defendants, it attached account number 649000101102 at Sovereign Bank which is designated as Defendants' payroll account. *See* Huynh Aff. at ¶ 25. This account is used exclusively to issue paychecks to employees of Spine Care. *Id.* Pursuant to M.G.L. c. 246 § 20, this account should never have been attached as it is a payroll account. As such, the attachment on account 649000101102 at Sovereign Bank must be dissolved immediately.

6

equal to or greater than the amount of the [attachment or trustee process.]" Mass. R. Civ. P. 4.1(c), 4.2(c). In addition, Rules 4.1(f) and 4.2(g) have special requirements and procedural protections for attachments that are sought *ex parte*. Parties seeking *ex parte* attachments must also prove one of the following:

> (i) the person of the defendant is not subject to the jurisdiction of the court in the action, or (ii) there is a clear danger that the defendant if notified in advance of the attachment on trustee process will withdraw the goods or credits from the hands and possession of the trustee and remove them from the state or will conceal them, or (iii) there is immediate danger that the defendant will dissipate the credits, or damage or destroy the goods to be attached on trustee process.

Mass. R. Civ. P. 4.1(f), 4.2(g).

A party seeking an attachment must actually prove it is entitled to relief. Motions for attachments must be supported by affidavits, which "shall set forth specific facts sufficient to warrant the required findings and shall be upon the affiant's own knowledge, information, and belief." Mass. R. Civ. P. 4.1(h), 4.2(c). The rules explicitly require that affidavits based on such "specific facts" support both the "reasonable likelihood of recovery" showing and the "clear danger" showing required for an *ex parte* attachment.

If an attachment obtained *ex parte* is subsequently challenged, the burden on the plaintiff to justify the attachment increases substantially. At a hearing on a motion to dissolve the attachment, "the plaintiff shall have the burden of justifying any finding in the *ex parte* order which the defendant has challenged by affidavit." Mass. R. Civ. P. 4.1(g), 4.2(h). As one Superior Court judge has explained,

> the initial burden lies with the defendant to introduce sufficient testimony to challenge any finding which the *ex parte* order rests. Once the defendant provides the required evidence, the burden shifts heavily back to the plaintiff to justify the attachment as if it had not previously been granted. 6 Smith and Zobel § 4.1.20.

7

> "The procedure for the dissolution of an attachment obtained *ex parte* is summary and weighted in the defendant's favor."

*Montague Corp. v. Simon Worldwide, Inc.*, 2001 WL 1226854 at *2 (Lauriat, J.) (quoting Mass. R. Civ. P. 4.1 Reporter's Notes).

### B.    The Plaintiff Has Not Demonstrated a Reasonable Likelihood of Success.

The standard for determining whether a plaintiff has shown a reasonable likelihood of success on the merits under Rule 4.2 has not been precisely defined.  "[W]hile certainty of success is not a prerequisite for maintaining a trustee process attachment, neither is the mere submission of affidavits alleging certain facts sufficient to sustain the extraordinary relief afforded by such an attachment." *Montague,* 2001 WL 1226854 at *3.  Where the amount of the plaintiff's recovery is uncertain, attachment of any amount may be unreasonable. *See Sheehan v. NetVersant-New England, Inc.*, 345 F. Supp. 2d 130, 132 (D. Mass. 2004) (denying motion for attachment where defendant's defenses were "at least facially meritorious," which indicated that plaintiff had not "met its burden of demonstrating that a recovery of … any specific amount is likely").  Whatever the precise standard may be, Metropolitan has not met it.

Nothing in the Huard affidavits — the sole evidentiary basis for the attachment — even remotely suggests that plaintiff is likely to recover a judgment of $800,000 or greater.  As a threshold matter, it must be noted that there is not a single sentence in the Huard affidavits that provides specific facts supporting the $800,000 damage figure alleged in Metropolitan's motion papers.  Not a single sentence in the affidavits indicates the number of allegedly false claims for payment submitted to Metropolitan, the amount of such claims, or even whether Metropolitan paid such claims.  In short, the only reference to any damage figure is the unsworn assertion of Metropolitan's counsel, *see* Pl. Huynh Mem. at 1; Pl. Spine Care Mem. at 1, which is entitled to

no weight at all, of course, given Rule 4.1(h)'s requirement of affidavits setting forth "specific facts."

Indeed the Huard affidavits do not even demonstrate that Metropolitan is likely to succeed on the merits at all. The lack of any factual basis for Metropolitan's sweeping allegations of a "fraudulent scheme" is startling. Although Huard describes the diligence of his investigation at length, ¶ 4 and presents his conclusion — "an extensive and continuing pattern of improper medical diagnoses, treatment, and billings," ¶ 5 — only two paragraphs of the affidavits (¶¶ 6-7) even purport to substantiate that conclusion. They are reproduced here in full:

6.    The testimony of <u>several</u> patients directly contradicts and refutes the medical records, notes, and bills submitted by Spine Care and Dr. Huynh with regard to:

    a.    the injuries actually sustained by the patient;

    b.    the subjective complaints of the patient during a particular treatment visit;

    c.    the types of treatment provided by Spine Care and Dr. Huynh;

    d.    the frequency of particular types of treatment provided by Spine Care and Dr. Huynh; and

    e.    whether a licensed chiropractor or an unlicensed administrative staff member administer the various treatments to the patients.

7.    A review of the medical bills submitted by Spine Care and Dr. Huynh indicates that existing patients are assigned new-patient Current Procedural Terminology ("CPT") codes, which are billed at a higher rate than the existing patient CPT codes that should be assigned.

Huard Aff. ¶¶ 6-7 (emphasis added).[4]

The defects in this showing are numerous. Among other things, many of Mr. Huard's assertions amount to medical judgments, and if his position as "Senior Investigator" qualifies

---

[4]    The paragraphs that purport to establish "fraud" on the part of the defendants (¶¶ 4-7) are identical in both Huard Affidavits.

him as a medical professional, the basis for that qualification is certainly not contained in his affidavit. But the most serious defects in the Huard affidavits are that his assertions are entirely anecdotal — and even the anecdotes themselves are entirely general. The central assertion in Paragraph 6, on which the fraud allegation of Metropolitan's counsel depends, is based only on the testimony of "several," unidentified patients. No false or even "improper" statement in any particular bill submitted by defendants is identified. And although Huard, perhaps deliberately, does not address this issue, the Complaint makes clear that the average claim of defendants' patients is approximately $3,000. *See* Complaint ¶¶ 5(e), 69, 78. Nor does Huard even allege that claims based on these patients' treatment were paid by Metropolitan. Plainly, an $800,000 attachment cannot possibly be justified on the basis of unspecified information about "several" such claims, when it is not even alleged that the claims were paid.

The assertion in Paragraph 7, regarding alleged upcoding of CPT codes, is equally anecdotal and equally ambiguous. How many repeat patients were there? What was the difference in the billing rate? Perhaps the most remarkable thing about the meagerness of Huard's affidavits is that Metropolitan has had every opportunity to conduct independent medical examinations of all claimants under § 34M, and can only come up with conclusory and unsubstantiated assertions. In short, not only is there no basis in Huard's Affidavit for an attachment in the amount of $800,000, there is no specific factual basis for finding that Metropolitan will prevail at all.

Huard's reference to the testimony of "several" patients in Paragraph 6, coupled with his assertion that his investigation "formed the basis for [Metropolitan's] Complaint against Dr. Huynh and Spine Care," ¶ 9, appears to mean that the "several patients" referred to by Huard are part of the group of 16 patients that are referred to in the Complaint. *See* Complaint ¶¶ 86-117.

Neither the affidavit nor the Complaint say anything about whether any bills associated with these patients were paid by Metropolitan. The affidavit of Dr. Huynh submitted here, however, demonstrates that of the bills associated with the 16 patients identified in the Complaint, only one was paid, in the amount of $1,079.75. *See* Exhibit B (Affidavit of Hai Nhu Huynh) ("Huynh Aff.") ¶¶ 22-23.

Plaintiff's inability to succeed on the merits is further demonstrated by the attached affidavit of Daniel J. Reida, which rebuts plaintiff's allegations. Daniel J. Reida, D.C., a chiropractic expert who conducted an in depth review of numerous patient files of the defendants and is qualified to testify on these issues, testified that there is a sufficient clinical rationale for the initiation of treatment, the continuation of treatment, and the type of treatment provided. *See* Exhibit C (Affidavit of Dr. Daniel J. Reida, D.C.) ("Reida Aff.") at ¶6(a) – (f). Furthermore, he testified that Dr. Huynh conducted comprehensive exams of his patients and that his objective findings justify the treatment provided. Reida Aff. at ¶¶ 2-6. In further support of the legitimacy of Dr. Huynh's practice, Dr. Reida, after examining patient records, including itemized billing statements, testified that there is no evidence of fraudulent conduct on the part of Dr. Huynh or Spine Care. *See* Reida Aff. at ¶¶ 2-4, 7. Clearly, the testimony of Dr. Reida, a chiropractic expert with excellent qualifications, carries more than enough weight to refute any allegations by Mr. Huard regarding patient injuries and treatment thereof, as Mr. Huard has no qualifications with which to testify in this area.

Finally, plaintiff's inability to succeed on the merits is also demonstrated in the memorandum in support of defendants' motion to dismiss the Complaint pursuant to Rule 9(b) and Rule 12(b)(6), attached hereto as Exhibit A. In brief, the Complaint by Metropolitan is a textbook example of the type of pleading that has been condemned by the First Circuit for

violating Rule 9(b)'s particularity requirements. Despite leveling most serious charges of fraud against Dr. Huynh, a medical professional serving a largely immigrant population, Metropolitan proceeds by way of rhetoric and repetition instead of particularized allegations, ignoring the abundant body of applicable law on Rule 9(b). Although it alleges that each and every one of 244 claims defendants (as assignees of their patients) have submitted are fraudulent, it makes no effort to comply with Rule 9(b)'s mandate that a fraud claim identify "the time, place, and content of an alleged false representation." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996). Indeed the Complaint makes no reference <u>at all</u> to 228 of the 244 allegedly false claims, relying instead on anecdote, innuendo, and repeated references to "fraud" and "schemes." The First Circuit has made it clear, however, that such hysteria is insufficient: "referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Because fraud is "at the core" of each of the Complaint's theories of recovery, Rule 9(b) applies to the Complaint in its entirety. *Id.* at 443. Accordingly, the entire Complaint should be dismissed under Rule 9(b).

Each of the Complaint's four counts also fails to state a claim on which relief can be granted, and each should be dismissed pursuant to Rule 12(b)(6). Count I (Fraud) fails because the Complaint fails to allege that plaintiff detrimentally relied on any fraudulent statement specifically alleged of defendants. Count II (Breach of Contract) fails because the Complaint does not allege facts demonstrating the existence of a contractual relationship between the parties. Count III (Negligence) fails because the Complaint's allegations do not sufficiently allege any "duty" owed by defendants to plaintiff. And Count IV, which alleges a violation of

Chapter 93A, is entirely derivative of the Count I fraud and Count II Breach-of-Contract claims, *see* Complaint ¶ 158, and is deficient for the same reasons as these counts.

In sum, plaintiff has failed to meet its burden and defendant has shown that it has meritorious defenses. As such there is little, if any, likelihood plaintiff will recover any judgment at all, much less an $800,000 judgment. At a minimum, the amount of any recovery is uncertain. *See Sheehan*, 345 F. Supp. at 132 (denying attachment motion where amount of recovery is uncertain). Accordingly, the attachments must be dissolved.

### C.    Plaintiff Has Not Demonstrated A Clear Danger That Dr. Huynh Would Remove or Conceal Assets.

As explained above, plaintiff's "clear danger" showing was premised on a combination of the alleged "fraudulent conduct" of Dr. Huynh and Spine Care, and the fact that Dr. Huynh "has utilized several different addresses within the last few years, including a current second residence in Texas." Pl. Br. at 4. Both parts of this showing collapse under the scrutiny afforded by the adversary process. As explained above, plaintiff's fraud allegations are conclusory and unsubstantiated, and plaintiff has not shown a likelihood of any recovery, much less an $800,000 recovery.

Nor is there any substance to Metropolitan's sinister allegation that Dr. Huynh has "utilized several different addresses within the last few years, including a current second residence in Texas." Pl. Br. at 4. The Huard affidavit identifies four different addresses with which Dr. Huynh has been "associated:"

    (a)    2411 Wycliff Avenue, Dallas, TX;

    (b)    81 Hardwick Road, Ashland, MA;

    (c)    291 West Central Street, Natick, MA; and

    (d)    2901 General DeGaulle Drive, New Orleans, LA.

Huard Aff. ¶ 16. Metropolitan's implication that he was simultaneously using different addresses, as part of some evasive tactical plan, is entirely disingenuous. Dr. Huynh's Affidavit demonstrates that his affiliation with each of these addresses is unremarkable.

Dr. Huynh is 32 years old. Huynh Aff. ¶ 3. He began his professional career in Dallas, Texas, where he attended and graduated from Parker College of Chiropractic in 1998. Huynh Aff. ¶¶ 6-7. The Wycliff Avenue address in Dallas is a home that has been owned by Dr. Huynh's wife, Tammy T. Nguyen, since approximately 1998, before she and Dr. Huynh met. *Id.* at ¶ 19. Ms. Nguyen's mother has lived in the house since 1998, and Dr. Huynh has only stayed in the house on occasional trips to Dallas. *Id.* Dr. Huynh's name is "associated" with the address because in 2004 he helped his wife refinance the property. *Id.* Dr. Huynh and his wife are in the process of getting divorced, and his wife has returned to the Wycliff Avenue house in Dallas to live. *Id.* at ¶ 20. When she left, she took with her the automobile (Lexus GX430, Mass. reg. 99ST39) identified in paragraphs 13 and 14 of the Huard affidavit. In sum, there is nothing unusual about Dr. Huynh's "association" with the Wycliff Avenue address in Dallas, or about a car registered in his name being seen there.

Dr. Huynh's affiliation with the other addresses is equally benign. The Hardwick Road address in Ashland is Dr. Huynh's current residence, where he has lived since September 2003. *Id.* at ¶ 11. The New Orleans address identified by Mr. Huard is the business address of a chiropractic practice where Dr. Huynh worked for just a few months (approximately August 1999 to February 2000). *Id.* at ¶¶ 7-8. The New Orleans practice was unsuccessful, and after it failed Dr. Huynh returned to Dallas to work for a short period of time before moving to Boston in the summer of 2000. *Id.* Dr. Huynh has lived in the Boston area continuously since the summer of 2000. *Id.* at ¶ 11.

The Natick address, 291 West Central Street, is the home of Dr. Huynh's sister, Kim H. Huynh, and her husband, Tri V. Nguyen. *Id.* at ¶ 11. Dr. Huynh's sister has been living in the Boston area since the 1980s. *Id.* at ¶ 10. Part of Dr. Huynh's decision to relocate to Boston in 2000, in addition to the opportunity to serve the area's large Vietnamese-American community, was his older sister's presence here, and her ability to help him establish his business. *Id.* Dr. Huynh incorporated his business, Spine Care and Therapy, Inc., in July of 2000, before any location for the business had been determined, and used his sister's Natick address, where he was living at the time, on the original articles of incorporation. *Id.* at ¶¶ 11, 14. Dr. Huynh's sister and brother-in-law, who initially financed and owned stock in the corporation, were identified as corporate officers on the original articles of incorporation. *Id.* at ¶ 12 Dr. Huynh later purchased their interest in the corporation, and they are no longer officers of the corporation or otherwise involved in the business. *Id.* at ¶ 15. In short, there is nothing remarkable about Dr. Huynh's association with the Natick address, and Dr. Huynh's sister and brother-in-law currently have no involvement in Spine Care.

In sum, nothing about these various other addresses that Dr. Huynh has "utilized" or been "associated with" is probative of any intent by Dr. Huynh to remove, dissipate, or conceal assets, or to dissolve Spine Care. Dr. Huynh has no intention of leaving the area or of moving or concealing assets. *Id.* at ¶ 27. To the contrary, Dr. Huynh intends to continue his practice and to vigorously defend himself against the unfounded charges against him. *Id.*

## IV.    CONCLUSION

For the reasons set forth above, defendants respectfully request that this Court dissolve the attachments on defendants' property and bank accounts.

Respectfully submitted,

HAI NHU HUYNH and
SPINE CARE AND THERAPY, INC.,

By their attorneys,

_/s/_James C. Rehnquist_____
James C. Rehnquist (BBO# 552602)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

_/s/_Andrew D.Nebensahl_____
Andrew D. Nebenzahl (BBO# 368065)
NEBENZAHL | DuBOSQUE, LLP
One Post Office Square
Sharon, MA  02067
(781) 784-2000

September 21, 2005

LIBA/1576919.5

16

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-11287-RGS

|  |  |
|---|---|
| METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, Plaintiff, | ) ) ) ) |
| v. | ) ) ) |
| HAI NHU HUYNH and SPINE CARE AND THERAPY, INC., Defendants. | ) ) ) ) ) |

## MEMORANDUM IN SUPPORT OF THE
## DEFENDANTS' MOTION TO DISMISS

Dr. Hai Nhu Huynh and Spine Care and Therapy, Inc. ("Spine Care") (collectively

"defendants") submit this memorandum in support of their motion to dismiss the Complaint by

plaintiff Metropolitan Property and Casualty Insurance Company ("plaintiff" or "Metropolitan"),

pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

## I.    INTRODUCTION

Metropolitan's Complaint is a textbook example of the type of pleading that has been

condemned by the First Circuit for violating Rule 9(b)'s particularity requirements. Despite

leveling most serious accusations of fraud against Dr. Huynh, a medical professional serving a

largely immigrant Vietnamese population in Dorchester, Metropolitan attacks not with

particularized allegations, as required by Rule 9(b), but with rhetoric, innuendo, and anecdote.

Although it alleges that each and every one of 244 claims made by defendants (as assignees of

their patients) are fraudulent, Metropolitan makes no effort to comply with this Circuit's mandate

that a fraud claim identify "the time, place, and content of an alleged false representation."

*Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996). Indeed the Complaint makes no reference at all to 228 of the 244 allegedly fraudulent claims, and even as to the 16 claims that are mentioned in the Complaint there is no reference to the date or even the content of the allegedly fraudulent statement. Instead the Complaint relies on repetitive and unsupported references to "fraud" and "schemes." The First Circuit has made it clear, however, that such pleading is insufficient: "referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Because fraud is "at the core" of each of the Complaint's articulated theories of recovery, moreover, Rule 9(b) applies to the Complaint in its entirety. *Id.* at 443. Accordingly, the entire Complaint should be dismissed under Rule 9(b).

In addition, each of the Complaint's four counts fails to state a claim on which relief can be granted, and each should be dismissed pursuant to Rule 12(b)(6). Count I (Fraud) fails because the Complaint fails to allege that plaintiff relied on any fraudulent statement specifically alleged of defendants. Count II (Breach of Contract) fails because the Complaint does not allege facts demonstrating the existence of a contractual relationship between the parties. Count III (Negligence) fails because the Complaint's allegations do not sufficiently allege any "duty" owed by defendants to plaintiff. And Count IV (Chapter 93A) is entirely derivative of the fraud and breach-of-contract claims, *see* Complaint ¶ 158, and fails for the same reasons as these counts. The entire Complaint should also be dismissed under Rule 12(b)(6).

## II.    BACKGROUND

Plaintiff's Complaint contains sweeping allegations regarding a "systematic" and "perpetual" "fraudulent scheme" perpetuated by defendants. Six of the Complaint's first seven paragraphs proclaim the alleged "fraudulent scheme," and the rhetoric only accelerates over the

remainder of the Complaint. Plaintiff generally identifies six wholly general categories of "false statements of material facts" in defendants' "patient treatment records and bills," Complaint ¶ 129,[1] and alleges it has been damaged in an amount in excess of $800,000, Complaint ¶ 5(e). This figure is based on the sum of payments allegedly made to defendants of over $494,000.00 on 165 individual claims for PIP benefits, Complaint ¶ 69, and an additional $306,000.00 on 79 bodily injury claims.[2]  Complaint ¶ 78.  In short, Metropolitan's $800,000 ad damnum figure is based on the allegation that each and every one of the 244 claims identified in the Complaint — an average claim being for $3,160.00 — was fraudulent.

Despite the hyperbole in the Complaint, however, the only remotely specific allegations of fraud have to do with bills for services defendants rendered to 16 patients. Complaint ¶¶ 86-114. This is approximately 7% of the total 244 claims and, using the average claim amount of $3,160.00, suggests that an ad damnum based on these alleged cases of fraud is more like $50,000. Not only is this sum $25,000 below the amount-in-controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332, it is $750,000 below the amount of the ex parte attachment plaintiff received. Although Metropolitan insists that these 16 cases in the Complaint are being provided "by way of example only," *see* Complaint ¶¶ 90, 92-94, 96-98, 100, 102,

---

[1]  Plaintiff alleges that Defendants made false/misleading statements in the following six categories:  statements "as to the type, existence and extent" of patients symptoms and injuries (Compl., at ¶ 129(a)); statements designed to conceal "exaggerated" diagnoses and treatment rendered that was not "medically reasonable or necessary" based on those diagnoses (Compl. at ¶ 129(b)); statements regarding treatments actually provided to patients (Compl. at ¶ 129(c)); statements as to the "efficacy of the treatments allegedly provided to each patient" and the periodic progress of his/her treatment programs (Compl. at ¶ 129(d)); statements as to "the causal link between the alleged injuries and the motor vehicle accident under which the PIP claim" was made (Compl. at ¶ 129(e)); and statements on patient progress reports that were designed to "frustrate, mislead and hinder" record reviews done by Metropolitan (Compl. at ¶ 129(f)).

[2]  These claims may or may not have been submitted directly to the Plaintiff but may have been the result of third party claims.

104,[3] it provides no factual basis for the inference it intends this Court to draw — namely, that the alleged infirmities in the billing records for 16 patients also exist in the records for the 200+ claims that are not included in the Complaint.

But even for the 16 patients identified in the Complaint, the specifics of Metropolitan's fraud allegation are wholly lacking. The allegedly fraudulent bills and/or medical records are not attached to the Complaint. Nor are they quoted from or even summarized in the Complaint. No date is provided for any bill sent on behalf of the 16 patients; no specific misstatement in any bill or record is identified. Most significantly, there is no allegation that the allegedly fraudulent bills for these 16 patients were, in fact, paid by the plaintiff. Plaintiff's references to its payments of bills are entirely general and cryptic. Complaint ¶¶ 68-69. *See also id.* ¶ 100 ("Defendants routinely billed for this modality as part of the patient's overall treatment").

## III. ALL COUNTS SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH FED. R. CIV. P. 9(B)

The First Circuit has made it abundantly clear that Rule 9(b) "requires specification of the time, place, and content of an alleged false representation." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (*quoting McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980)); *Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("this means the who, what, when, where, and how: the first paragraph of any newspaper story"). "Mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and

---

[3]  Plaintiff submitted anecdotal evidence "by way of example only" of only: ten patients who allegedly received less costly treatments than were billed (Compl., at ¶¶ 86-94), three (new) patients who received treatment for fictitious injuries (Compl., at ¶¶ 95-98), thirteen patients to whom treatments billed were never provide (Compl., at ¶¶ 99-105), three patients for whom false examination findings were made (Compl., at ¶¶ 106-109), three patients who claim Dr. Huynh was not present for their treatment (Compl., at ¶¶ 110-114), three patients whose records were inconsistent with their treatment (Compl., at ¶¶ 115-117) and four sets of patients who received similar treatment (Compl., at ¶¶ 118-119). The patients who are cited as examples for the various kinds of alleged fraudulent practices overlap greatly in each category. Only approximately sixteen different patients are referenced throughout all of Plaintiff's Complaint.

schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Doyle*, 103 F.3d at 194 (quoting *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985)).

Rule 9(b)'s purposes are to provide adequate notice to defendants of plaintiffs' claims, to discourage "strike suits," to prevent plaintiffs from filing suits merely hoping to uncover relevant evidence during discovery, and to protect the reputations of defendants from meritless claims of fraud. *Doyle*, 103 F.3d at 194. Rule 9(b) applies, moreover, not only to the counts in a complaint that are explicitly denominated as "fraud" claims. The First Circuit has made it clear that Rule 9(b) applies in all cases " in which fraud lies at the core of the action." *Hayduk*, 775 F.2d at 443. Judges in this Circuit have not hesitated to apply Rule 9(b) to all manner of claims that are, in essence, based on allegations of fraud. *See Lucia v. Prospect Street High Income Portfolio, Inc.*, 769 F. Supp. 410, 416-417 (D. Mass. 1991) (Mazzone, J.) (applying Rule 9(b) to negligence claim where "it is clear that fraud, not negligence, lies at the core of the complaint"); *Mosko v. Defilippo*, 1991 WL 191211 (D. Mass. 1991) (Zobel, J.) ("To the extent that the plaintiff's other remaining claims, e.g., negligent misrepresentation and breach of contract, are premised upon fraud, these allegations must also comport with the requirements of Rule 9(b).")(citing *Hayduk*, 775 F.2d at 443-44).

As a threshold matter, there can be no serious dispute that fraud is "at the core" of Metropolitan's Complaint here, even though only Count I is explicitly denominated as a "fraud" claim. The contract, negligence, and Chapter 93A counts are entirely derivative of the fraud allegations. The term "fraudulent scheme" is used in six of the Complaint's first seven paragraphs, and the rhetoric of fraud continues unabated throughout the Complaint. *See* Complaint ¶ 25-40 ("The Scheme"), ¶ 41 ("false . . . diagnosis"), ¶ 44 ("fraudulent treatment plan"), ¶¶ 41-65 (describing the elements of the alleged "fraudulent treatment scheme"), ¶ 66 ("fraudulent records and bills"), ¶ 73 ("fraudulent claims"), ¶ 74 ("fraudulent bills"), ¶ 79("fraudulent treatment"), and ¶ 85 ("fraudulent scheme"). All of these allegations are incorporated by reference into the other three counts, Complaint ¶¶ 136, 142, 155, and there are

5

no other, non-fraud-based, material facts alleged to support the theories of recovery alleged in these counts. Accordingly, since fraud is "at the core" of the Complaint, Rule 9(b) applies to all counts.

Plaintiff's Complaint falls far short of Rule 9(b)'s requirements. Most obviously, even with respect to the 16 patients whose medical treatment is mentioned, the Complaint fails to allege the "time, place, and content of an alleged false representation." *Doyle*, 103 F.3d at 194. No date or amount is provided for any bill submitted by defendants. No allegedly false statement in any bill or medical record is identified. There is not even any allegation that any bill for the 16 patients was paid. *See Sebago, Inc. v. Beazer East*, 18 F. Supp. 2d 70, 89 (D.Mass. 1998) (reliance element of fraud claim must be alleged with particularity). In sum, the Complaint relies on rhetoric and anecdote instead of particularized factual allegations, and is a textbook example of the type of pleading condemned by the First Circuit in *Hayduk*. In that case, the Court stated that "mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated. 775 F.2d at 444. Here, as in *Hayduk*, plaintiff substitutes volume, rhetoric, and repetition for particular allegations. Here, as in *Hayduk*, the Complaint should be dismissed.

This Court addressed the applicability of Rule 9(b) to allegations of fraudulent billing in *Gublo v. NovaCare, Inc.*, 62 F. Supp. 2d 347 (D. Mass. 1999). In *Gublo*, a *qui tam* action brought under the False Claims Act, 31 U.S.C. § 3729, the relator alleged that the defendant billed the government for expensive orthotic and prosthetic devices while in fact supplying patients with cheaper devices. *Id.* at 349. As to the orthotic devices, plaintiff identified not only the nature of the over billing but also specifically alleged the payer, date, and practitioner for the over billing. *Id.* at 354. As to the prostetic devices, on the other hand, plaintiff alleged no specific false claims but based its allegations on anecdotal conversations with employees of defendant, observations of third parties, and the defendant's billing forms. *Id.* at 349-50. Accordingly, this Court found the plaintiff's allegations as to the orthotics sufficient but found

6

the allegations as to the prosthetics overbilling deficient, and dismissed that portion of the claim. *Id.* at 354-355. The reasoning of *Gublo* applies here, and the Complaint should be dismissed.

## IV.    ALL COUNTS SHOULD ALSO BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER FED. R. CIV. P. 12(B)(6)

In addition to its infirmities under Rule 9(b), the Complaint also fails to state a claim upon which relief can be granted.  In order to survive a challenge under Rule 12(b)(6), a complaint must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996).  The court must accept as true only the well-pleaded facts in the complaint and need not give deference to unsupported assertions or legal conclusions. *Abbott v. United States*, 144 F.3d 1, 2 (1st Cir. 1998).  Plaintiff has failed to meet these pleading standards.

### A.    Plaintiff's Fraud Allegation Fails.

Plaintiff's fraud claim rests on, at most, cryptic allegations of impropriety with respect to 16 out of 244 patient records for which Spine Care allegedly submitted claims for payments to Metropolitan. Although the allegations even as to those 16 patients fail under Rule 9(b), they are also deficient under Rule 12(b)(6), as plaintiff does not allege in any form — particular or otherwise — that it paid any of the 16 claims. It is well stated under Massachusetts law that detrimental reliance is an element of a common law fraud claim. *E.g., Piantes v. Pepperidge Farm, Inc.*, 875 F. Supp.929, 933 (D. Mass. 1995).  For this reason, Count I must be dismissed pursuant to Rule 12(b)(6).

### B.    Plaintiff's Breach of Contract Claim Fails.

Plaintiff's breach of contract claim is based on an alleged "statutory contract" that supposedly provides it with a right of action against defendants. Complaint ¶¶ 17, 136-141. Specifically, Metropolitan alleges that this "contract" is created by operation of the Massachusetts No-Fault statute, M.G.L. c. 90, § 34M, which provides that injured persons who do not timely receive "personal injury protection" ("PIP") benefits mandated thereunder can bring a "contract" action against any insurer withholding payment. *Id.*

Plaintiff's purported contract claim is an unwarranted attempt to turn § 34M on its head. Section 34M allows an injured party or his assignee to submit claims for PIP benefits directly to the automobile insurer. *Id.* at ¶ 3. It also provides a mechanism whereby a PIP claimant can pursue a remedy against an insurer that withholds claimed PIP benefits, despite the lack of "privity" between the injured party and the insurer:

> [i]n any case where benefits due and payable remain unpaid for more than thirty days, any unpaid party shall be deemed a party to a contract with the insurer responsible for payment and shall therefore have a right to commence an action in contract for payment of amounts therein determined to be due in accordance with the provisions of this chapter.

*Id.* at ¶ 4. Nothing in § 34M, however, provides a cause of action <u>for an insurer</u> against a licensed practitioner for breach of contract. As countless cases have recognized, the purpose of § 34M is to provide injured parties with an efficient means of receiving compensation for their most pressing needs. *E.g., Fascione v. CNA Ins. Cos.,* 435 Mass. 88, 94 (2001). The rearrangement of commercial relationships suggested by Metropolitan is well beyond the statute's plain purpose.[4]

---

[4] The insurer is not powerless, of course, when confronted with a demand for PIP benefits. In order to show that a demand is not due and payable, the insurer may have it reviewed by a licensed practitioner, and if the licensed practitioner finds that the bill is inflated then the insurer need only pay the amount the licensed practitioner finds reasonable. M.G.L. c. 90 § 34M.

Even if Metropolitan's fanciful reading of § 34M could somehow be harmonized with the statute's language and purpose, its contract claim fails for the additional reason that the Complaint does not allege the necessary elements of such a claim. Those elements are: (1) an agreement supported by valid consideration; (2) that plaintiff was ready, willing, and able to perform its obligations; (3) that defendant's breach prevented plaintiff from performing; and (4) that plaintiffs were damaged. *Doyle v. Hasbro*, 103 F.3d at 194 (citing *Siganella v. City of Boston*, 342 Mass. 385, 389 (1961)). As the First Circuit has stated, it is "essential to state with 'substantial certainty' the facts showing the existence of the contract and the legal effect thereof." *Id.* Here, as in *Doyle*, the Complaint fails to specifically allege the nature of any contract, the formation of any such contract, the terms of any such contract, defendant's willingness to perform the contract, or the damages attributable to any breach . *Doyle,* 103 F.3d at 195. Here, as in *Doyle*, the contract claim must be dismissed.

### C.    Plaintiff's Negligence Claim Fails

All of the allegations germane to Count III's negligence theory are based on "applicable Massachusetts regulations," Complaint ¶¶ 142-154, that are nowhere identified in the Complaint. Despite these mysterious references, there appear among the mismash of these paragraphs to be three strands to Metropolitan's negligence theory. First, Metropolitan seems to be suggesting that defendants breached their duty to their patients. *See* Complaint ¶¶ 146-147 (alleging breach of duty to provide certain treatments only when licensed staff were on premises); ¶¶ 148-149 (alleging breach of duty not to delegate decisions regarding a patient's treatment plan to unlicensed staff). Second, Metropolitan also appears to be alleging that defendants breached a duty mandated by "applicable Massachusetts regulations," nowhere identified, to "not to engage

in excessive treatment or excessive billing in the cause of its practice." Complaint ¶ 150.[5]

Neither theory of negligence, no matter how generously the Complaint is construed, is sufficient to state a claim under Rule 12(b)(6), as neither theory sufficiently alleges that defendants owed a duty to plaintiff. *See Delaney v. Reynolds*, 63 Mass. App. Ct. 239 (2005) (citing *Glidden v. Maglio*, 430 Mass. 694, 696 (2000)) (existence of a legal duty owed to plaintiff is an element of any negligence claim).

First, to the extent Count III is based on allegations akin to "medical malpractice," the claim fails. It is hornbook law that a medical malpractice plaintiff must demonstrate the existence of a doctor-patient relationship, that the doctor's performance did not conform to good medical practice, and that the plaintiff was damaged as a result. *Kapp v. Ballantine*, 380 Mass. 186 (1980); *Perez v. Bay State Ambulance & Hosp. Rental Serv. Inc.*, 413 Mass. 670 (1992). Plaintiff also must show that the defendant personally owed plaintiff a duty of care, which was breached. *Santos v. Kim*, 429 Mass. 130, 138 (1999). Plainly, plaintiff has not alleged a doctor-patient relationship between it and defendants, and any negligence claim based on such "medical malpractice" allegations must fail.[6]

---

[5] As a third possibility, there is a single fleeting allegation in ¶ 153 to "negligent supervision of [defendants] employees." This theory, to the entent it is sufficiently alleged, must be dismissed because there is no attempt to allege the requisite elements of such a claim. *See Moylan v. Stop and Shop Companies, Inc.*, 2001 WL 262661 at *2 (Mass. Super. March 14, 2000) (elements of negligent supervision claim include that employee's alleged misconduct was foreseeable to defendant).

[6] Additionally, in Massachusetts, medical malpractice claims must, in the first instance, be brought before a medical malpractice tribunal. Pursuant to M.G.L. c. 231, § 60B, "[e]very action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal...". M.G.L. c.231, § 60B. A health care provider is defined by the statute to include "a person, corporation, facility or institution licensed by the commonwealth to provide health care or professional services as a ... chiropractor ... or agent thereof acting in the course and scope of his employment." M.G.L. c.231, § 60B. Because Dr. Huynh and Spine Care are both health care providers within the definition of Section 60B, any treatment related claims against them must first be brought before the medical malpractice tribunal and, therefore, are improperly before this Court and must be dismissed. *Little v. Rosenthal*, 376 Mass. 573, 576 (1978) (holding that "all treatment-related claims [against a health care provider] were meant to be referred to a malpractice tribunal").

Second, the Complaint also fails to the extent it is premised on a theory of "negligent billing." Again, the defect is the failure to allege facts demonstrating a duty owed to the plaintiff. Plaintiff bases this portion of its claim entirely on the conclusory allegation that defendants have a duty under "applicable Massachusetts regulations…not to engage in excessive treatment or billing in the course of its [sic] practice." Complaint at ¶ 150. The "applicable regulation" that is the apparent source of this "duty" is nowhere identified in the Complaint, however. This wholly generalized reference to an "applicable regulation" is precisely the sort of "bald assertion," or "unsubstantiated conclusion" that need not be credited in considering a motion to dismiss under Rule 12(b)(6). *Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1 (D. Mass. 2004) (Saris, J.). In addition, in as much as there is no freestanding cause of action for "negligent billing," plaintiff must allege the necessary elements of "negligent misrepresentation," which it plainly has not done. The elements of such a claim are that the defendant (1) in the course of business, (2) supplie[d] false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others, (5) by their justifiable reliance on the information, and 6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Savers Property & Cas. Ins. Co., v. Admiral Ins. Agency*, 61 Mass. App. Ct. 158,169 (1998). At a minimum, element (4) in this list has not been alleged. Count IV, which alleges a violation of Chapter 93A, is entirely derivative of the Count I fraud and Count II Breach-of-Contract claims, *see* Complaint ¶ 158, and is deficient for the same reasons as these counts. Although paragraph 158 also alleges that defendants engaged in "intentional interference with an advantageous business relationship," although this theory of recovery is not mentioned anywhere else in the Complaint and the allegations necessary to support such a claim are not contained in the Complaint.

11

In sum, plaintiff's negligence allegations are deficient, and this Count should be dismissed as well.

## V.    CONCLUSION

For the reasons set forth above, defendants respectfully request that the Complaint be dismissed in its entirety with prejudice.

Respectfully submitted,

HAI NHU HUYNH and
SPINE CARE AND THERAPY, INC.,

By their attorneys,

_/s/_James C. Rehnquist_____
James C. Rehnquist (BBO# 552602)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

__/s/ Andrew D.Nebensahl_____
Andrew D. Nebenzahl (BBO# 368065)
NEBENZAHL | DuBOSQUE, LLP
One Post Office Square
Sharon, MA  02067
(781) 784-2000

September 16, 2005
LIBA/1577944.3

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-11287-RGS

METROPOLITAN PROPERTY AND      )
CASUALTY INSURANCE COMPANY,     )
Plaintiff,                     )
                               )
v.                             )
                               )
HAI NHU HUYNH and              )
SPINE CARE AND THERAPY, INC.,  )
Defendants.                    )

## AFFIDAVIT OF HAI NHU HUYNH

I, HAI NHU HUYNH, BEING DULY SWORN, SAY AND DEPOSE AS FOLLOWS:

1.    I am a licensed chiropractor and President of Spine Care And Therapy, Inc. ("Spine

Care"). Spine Care is the corporation under which I practice as a chiropractor. The practice has

been located at 413 Neponset Avenue, Dorchester, Massachusetts since March of 2002. Prior to

that time, the practice was located across the street at 406 Neponset Avenue, Dorchester,

Massachusetts.

2.    I am submitting this affidavit to the Court in response to the charges in the Complaint and

memorandum in support of Plaintiff's Motion for Attachment filed by Metropolitan Property and

Casualty and Insurance Company.

## PERSONAL BACKGROUND

3.    I was born in South Vietnam on December 29, 1973, while my father was serving in the

South Vietnamese Armed Services. At the beginning of 1979, as my parents were impoverished,

my father decided to take our family out of Vietnam in search of opportunities in a western

country. I have three sisters and one brother.

4.      We arrived in the United States on January 20, 1980 after traveling on a packed fishing vessel, landing in Indonesia, surviving in a refugee camp for nine months and finally being sponsored by a church group in Cincinnati, Ohio.  The effort to bring my family to the United States was the result of the work of numerous people who I have vowed to honor by my work and my citizenship in the United States.

5.      After living in Cincinnati for approximately a year and a half, our family moved to Galveston County, Texas.

6.      I attended the Parker College of Chiropractic in Dallas, Texas from August of 1995 through August 1998. After taking the Chiropractic Oath, I walked the stage as a doctor of chiropractic. Along with obtaining my citizenship in the United States, this was the proudest moment of my life.  I felt that as a chiropractor, I had been empowered with the knowledge and skills to help the people of my community.

## PROFESSIONAL AND BUSINESS HISTORY

7.      I began my career in 1998 as an associate doctor at Blue Sky Chiropractic in Dallas, Texas, where I remained in practice for nine months.  It was through this experience that I developed my understanding of how to practice as a chiropractor.  In August 1999, I opened a practice in New Orleans, Louisiana, with two other chiropractors, Dr. Michael Nguyen and Dr. Thanh Huynh (no relation) as partners.  I had known both Dr. Nguyen and Dr. Huynh in chiropractic college and thought both were excellent practitioners.

8.      After seven months, it became clear that the practice could not support all three doctors. Therefore, in approximately February of 2000, Dr. Huynh and I decided to sell our interest in the practice to Dr. Nguyen and look for opportunities elsewhere.  Both Dr. Huynh and I sustained a significant loss.

2

9.      Once I left the practice in New Orleans, I moved back to Dallas and returned to Blue Sky Chiropractic to work as an associate.

10.     Sometime that summer, I decided to move to Boston because of the opportunity to serve the Vietnamese community in the Dorchester area. Part of my decision to relocate to Boston was made because I had an older sister, Kim H. Huynh, who had been living in Boston for over 15 years. Moreover, she had access to capital and credit to assist me in starting a practice in the Boston area.

11.     I moved to Boston in July 2000. I have lived continuously in the Boston area since then. I lived with my sister and her brother-in-law at 291 W. Central St. in Natick from July 2000 to July 2001. From July 2001 to September 2003 I lived in Framingham, and since then I have lived at 81 Hardwick Road in Ashland.

12.     Because I did not qualify for a loan myself when I first moved to Boston, my sister, Kim H. Huynh, and her husband, Tri V. Nguyen, put up the money for the practice and initially owned the stock in the corporation which was formed to operate the practice. The corporation was established as a "C" corporation, as opposed to a Sub-chapter "S" corporation to which it was later converted.

13.     It was our understanding from the inception of the business that once the practice developed and my finances had improved, that I would buy out their interest.

14.     Spine Care was incorporated in July 2000, but a physical location for the practice was not found until October. As a result, the original Articles of Incorporation listed the location of the business as 291 W. Central St., Natick, Massachusetts, the home of Kim H. Huynh, and Tri V. Nguyen. In addition, Spine Care was originally organized as a "C" corporation. Based on

3

professional advice, Spine Care was converted to a Sub-chapter "S" in December 2000. This was effective on January 01, 2001.

15.    On or about August 2001 as originally contemplated, I purchased the ownership of the practice from my sister and brother-in-law, and I became the sole stockholder of Spine Care, and I remain so today. My sister and brother-in-law are no longer officers of the corporation or involved in the business.

16.    After a year and a half, in approximately December 2002, I decided to open an additional practice. Because I needed to be at Spine Care full-time, I asked Doctor Nguyen with whom I had practiced in New Orleans, to become my partner in this practice. Thus, Chirotherapy and Rehab, Inc. was established. I am only 50% stockholder and the office is distinct from Spine Care, which Dr. Nguyen has no ownership or financial interest.

17.    It is my understanding that Dr. Nguyen sold his practice in Louisiana to move to Boston. By that time, I had been separated from that practice for over two years. I did not participate in the sale of his practice at all.

### THE EUROPEAN TOUCH SPA

18.    The European Touch Spa is a nail salon in Framingham. It is my understanding that this business is owned and operated by my sister, Kim H. Huynh and her husband, Tri V. Nguyen. I have no involvement in that business whatsoever. Moreover, I have no financial interest in that business, whatsoever. Indeed, to the best of my memory, I have never been inside the shop.

### THE REAL ESTATE IN TEXAS

19.    The plaintiff has raised a question about real estate located at 2411 Wycliff Avenue in Dallas, Texas. This is a home my wife, Tammy T. Nguyen, has owned since 1998, before we met. Ms. Nguyen's mother has lived in the house since 1998, and I have only stayed in the house

4

on occasional trips to Dallas. In early 2004, Ms. Nguyen decided to refinance the property and asked me for assistance. Shortly after that, she and I began to have personal problems and she began to spend a great deal of time in Dallas at the Wycliff Ave. home.

20.    In February of this year, I filed a Complaint for Divorce and in March my wife and my son moved to 2411 Wycliff Ave. in Dallas to live. When she moved, she took one of our vehicles, a Lexus [GX430] with her. The license plate on the vehicle when she left Massachusetts was 99ST39. This is the vehicle identified in the Affidavit of Mark O. Huard which was submitted by the plaintiff in this law suit.

## BILLS PAID BY METROPOLITAN

21.    I understand that Metropolitan Property and Casualty Company, Inc. ("Metropolitan") filed a Complaint against me and Spine Care, alleging that my company and I submitted misstated or fraudulent bills.

22.    I further understand that in its Complaint, plaintiff identified sixteen patients by name whom I treated and for whom I allegedly submitted fraudulent bills.

23.    Of these sixteen patients listed, Metropolitan only made payment on one bill for one patient, Anh Bui. The bill for Mr. Bui's treatment was in the amount of $1,095.00, and Metropolitan paid $1,079.75 of this bill. This was the only bill submitted to Metropolitan for Mr. Bui.

24.    I vehemently deny the allegations of fraud contained in the Complaint filed against me and Spine Care, and look forward to this Court hearing the truth about those allegations, should it be necessary.

5

## THE PAYROLL ACCOUNT

25.    I understand that Metropolitan secured an attachment in the amount of $800,000.00

against accounts associated with me and Spine Care. As part of that attachment, account

#649000101102 at Sovereign Bank was attached.  Account #649000101102 at Sovereign Bank is

the bank account which is designated by Spine Care as its payroll account, and used exclusively

to issue paychecks to employees of the corporation.

26.    Since Metropolitan received its attachment on my bank accounts in June 2005, I have had

some difficulty managing my affairs.  In order to operate my practice, and on the advice of my

counsel, I opened a new operating account at Century Bank and recorded a Declaration of

Homestead on my home in Ashland.  I understand that both of these were perfectly legal steps.

## SUMMARY

27.    In summary, I wish the Court to know that I am enormously grateful for the opportunities

that I have been afforded in the United States; that I am honored and proud to be practicing

chiropractor in Boston; that I intend to stay here, continue my practice and successfully defend

myself against the allegations which have been brought by Metropolitan Property and Casualty

Insurance Co.; that I am not going to dissolve my business or move or conceal assets; that I am

not moving to Texas; and that I sincerely believe that at the end of this litigation, I will not be

found to owe money damages to liable to Metropolitan Property and casualty Insurance Co.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS /5ᵀᴴ DAY OF SEPTEMBER, 2005

HAI NHU HUYNH, D.C.

LJBA/1577117.1

7

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-11287RGS

METROPOLITAN PROPERTY AND )
CASUALTY INSURANCE COMPANY, )
Plaintiff, )
                               )
v. )
                               )
HAI NHU HUYNH and )
SPINE CARE AND THERAPY, INC., )
Defendants.

### AFFIDAVIT OF DANIEL J. REIDA, D.C.

I, DANIEL J. REIDA, D.C., BEING DULY SWORN, SAY AND DEPOSE AS
FOLLOWS:

1.      I am a licensed chiropractor and have been practicing since 1972. A copy of my Curriculum Vitae is attached to this affidavit.

2.      I am familiar with the laws, regulations and clinical protocols governing the chiropractic profession and the administration of a chiropractic clinic in Massachusetts. I am also familiar with the laws and regulations governing the submission of claims for payment of bills pursuant to the Massachusetts No Fault Automobile Insurance system. I have gained this familiarity through my clinical practice as well as through my work as a clinical compliance monitor for the Massachusetts Board of Registration of Chiropractors as well as a certified independent chiropractic examiner. My certification is by the American Board of Independent Medical Examiners.

3.      I have been asked to review various treatment records involving patients of Dr. Hai Huynh and Spine Care and Therapy, Inc. which have been the subject of a law suit brought by the Metropolitan Property and Casualty Insurance Co. The files I reviewed all contained the following documents:

1.    Initial Case Summary;
2.    Treatment Protocol;
3.    Physical Examination Forms;
4.    Chief Complaint Forms;
5.    Patient Progress Reports;
6.    Itemized Billing Statements;

In addition, some files contained records of, Emergency Room visits, a Narrative Report

and letters from claims adjusters and lawyers from McGovern & Ganem.

4.    The patients whose files I examined are identified as follows:

| Patient Name | Claim No. |
| --- | --- |
| Nhut Cao | WBB96985 KD |
| Muoi Thi Huynh | WBB 92967 XQ |
| Anh T. Bui | WBB94815 KP |
| Dung Le | WBB99010 XQ |
| My Khiet | WBC03456 XB |
| Ronald Kwan | WBC05727 XQ |
| Rene Kwan | WBC05727 XQ |
| Duong Le | WBB99010 XQ |
| Than Le | WBB94815 KP |
| Dat Nguyen | WBC22552 KD |
| Steven Nguyen | WBC1443 XO |
| Thanh Nguyen | WBB99010 XQ |
| Oanh Tang | WBC2252 XB |
| Meo T. Tran | WBB92967RC |
| Hoang Nguyen | WBB83702XQ |
| Thuy Nguyen | WBB83702 XQ |
| My Nguyen | WBB83702 XQ |
| Minh Doan | WBC05727CO |
| Hong Ha T. Nguyen | WBC15284 EC |
| La V. Nguyen | WBC0235 XA |
| Wanida Limpanatham | WBB65605 DW |
| Siew Kong Wong | WBB10611 KE |
| Le V. Le | No Claim Number |
| Thai V. Tran | No Claim Number |
| Xiao Xue Yang | CRB36762 EP |
| Juan C. Salazar | WBC29583 KB |
| ~~Ricky Ngo~~ | ~~WBC32696~~ |
| ~~Nicole Tran~~ | ~~WBC77676 DM~~ |
| Dung S. Le | No Claim Number |
| Tam Nguyen | WBB83702 XQ |
| Thinh Tran | WBC25910 XQ |

Delete

| | |
|---|---|
| Lam Nguyen | WBB57576 CO |
| Phung C. Hoang | WBB57576 CO |
| Bick Ngoc T. Tran | WBB82832 |
| Tien K. Tang | WBB36584 CK |
| Luis Vicente | No Claim Number |
| Can V. Tang | No Claim Number |
| Kim H. Tang | WBB36584 C |
| Phi Khanh Vu | CRB28836 EP |

5.    I have also discussed the treatment rendered to these patients with Dr. Hai Huynh in an effort to understand the treatment decisions which were made and the clinical basis for those decisions.

6.    It is my opinion, based on a reasonable degree of medical certainty that with respect to each of these patients:

a.    There was a comprehensive examination performed on each patient's initial visit with objective findings that justify the type of care which was prescribed by Dr. Huynh;

b.    There is appropriate clinical rationale for the initiation of chiropractic treatment in each case;

c.    There is appropriate clinical rationale for the supportive modalities which were administered in each case.

d.    Dr. Huyhn has justified the on-going care of these patients as articulated within his initial examination and subsequent evaluations.

e.    The progress which is reflected in the patient is consistent with the progress which is to be expected in a patient with the injuries which were diagnosed and the treatment provided. In other words, the patients responded appropriately to the treatment which was administered, and as such, treatment was modified and reduced appropriately.

f.    Each patient was discharged within a clinically reasonable time.

7.    Further, it is my opinion that, contrary to the claims made by the Plaintiff, the

materials presented do not show evidence of fraudulent conduct by Dr. Huynh or Spine Care and

Therapy, Inc.

SIGNED UNDER THE PAINS AND PENALTIS OF PERJURY THIS 26th DAY OF

JULY, 2005

DANIEL J. REIDA, D.C.

# Bass River HealthCare Associates, Inc.

*Professionals with a passion for excellence.*

Dr. Daniel J. Reida
*Chiropractor*

Gordon E. Smith
*Physical Therapist*

Gail Haden
*Physical Therapist Assistant*

Laurie Hulten
*Physical Therapist Assistant*

Karen Booth
*Massage Therapist*

Diana Bassett
*Massage Therapist*

Patti DesJardins
*Massage Therapist*

Nancy Langley
*Reflexologist*

Nan Govoni Reida
*Massage Therapy Director*

Jennifer McGinn

Janet Teglas

Daniel J. Reida, D.C.

Curriculum Vitae

## PROFESSIONAL EXPERIENCE

Founder and Director of Bass River HealthCare Associates, Inc. formerly Bass River Chiropractic, an outpatient Chiropractic, Physical Therapy & Massage Therapy facility specializing in general practice, personal injury, workman's compensation, and rehabilitation of the injured patient, from 1972 to the present.

## DEGREES

Associate in Arts, Palmer Junior College, 1971
Bachelor of Science, Palmer Chiropractic College, 1971
Doctor of Chiropractic, Palmer Chiropractic College, 1971

## ACHIEVEMENTS

Awarded X-ray Internship Scholarship, Senior Year, Palmer College of Chiropractic, 1971
Nominated for Clinical Excellence Award, Senior Year, Palmer College of Chiropractic, 1971
Vice President, Senior Class, Palmer College of Chiropractic, 1971
National and International Lecturer since 1984 on topics ranging from philosophy to exercise and neurology
Co-authored National Best Seller 2004 "World's Best Kept Health Secret - Revealed"

## POST GRADUATE CERTIFICATIONS

Diplomate, National Board of Chiropractic Examiners, 1971
Licensed Chiropractor, State of Massachusetts (License #344), 1972 to date
Rehabilitation for the Primary Care Practitioner, Certificate from Logan College of Chiropractic, April, 1994
Chiropractic Neurological Technique, Certificate from Logan College of Chiropractic, August 1994.
Board Qualified in Chiropractic Neurology, Logan College, 1995
Credentialed Chiropractor, Interqual, 1995.

# Bass River HealthCare Associates, Inc.

*Professionals with a passion for excellence.*

Dr. Daniel J. Reida
*Chiropractor*

Gordon E. Smith
*Physical Therapist*

Gail Haden
*Physical Therapist Assistant*

Laurie Hulten
*Physical Therapist Assistant*

Karen Booth
*Massage Therapist*

Diana Bassett
*Massage Therapist*

Patti DesJardins
*Massage Therapist*

Nancy Langley
*Reflexologist*

Nan Govoni Reida
*Massage Therapy Director*

Jennifer McGinn

Janet Teglas

American Board of Independent Medical Examiners – Certified
Independent    Chiropractic Examiner, certificate #: 02-00031, 2002
Clinical Practice Monitor for Massachusetts Chiropractic Board of Registration,
     2003 to present.
Graston (Soft tissue) Technique certified 2005

## PROFESSIONAL ORGANIZATIONS

Board of Director, Massachusetts Chiropractic Society 2001 to present
President, Cape Cod Chiropractic Society, 1979-1984, 1998 to present
Secretary/Treasurer, International Chiropractic Knights of the Roundtable, 1990 to 1992
President, International Chiropractic Knights of the Roundtable, 1994 to 1996
Member, Massachusetts Chiropractic Society, 1971 to present
Member, American Chiropractic Association, 1971 to present
Reserve Deputy Sheriff Barnstable County Massachusetts

Provider for:
Harvard Pilgrim Healthcare, Pilgrim Select, Pilgrim First Seniority, Blue Cross and Blue Shield, HMO Blue Products, Blue Care 65, Medicare, Mass Health.

## COMMUNITY ACHIEVEMENTS

Big Brother of the Year, 1996 – Big Brother/Big Sister
Have taught Fatherhood Seminars